# Louisville & Interurban Railroad Company v. Morgan.

(Decided March 16, 1917.)

## Appeal from Jefferson Circuit Court (Common Pleas Branch, Second Division).

1. Railroads—Private Crossings—Operation.—At a private crossing, in the country, the railroad is not required to give any warning of the approach of its trains, nor to moderate the speed of its cars, but may operate them at such speed as it desires, consistent with the safety of its passengers.

2. Railroads—Private Crossings—Failure to Give Signals.—If a railroad company has customarily given signals of the approach of a train to a private crossing and these were relied on by the persons using the crossing, and one is injured on the crossing by a failure to give the signals, a recovery may be had.

3. Railroads—Crossings—Lookouts.—Wherever, from the nature and use of a crossing by the public, the duty is imposed upon the ones operating the railroad train or cars to anticipate the presence of persons upon the crossing, the duty of maintaining a lookout, to give warning of the approach of the cars, and to have the train or car under reasonable control follows.

4. Railroads—Precautions as to Persons at Crossings.—If a railroad company invites the public to make use of a crossing, it becomes its duty to anticipate the presence of persons upon the crossing, and to take and maintain such reasonable precautions for their safety as the situation demands and is usual in such cases.

5. Railroads—Action for Injury to Automobile.—Where one sues a railroad company for damages to his automobile by a train or car colliding with it upon a crossing, it is not error for the court to refuse to specifically instruct the jury, that it is negligence on the part of the automobilist to fail to sound his horn when approaching the crossing.

6. Railroads—Duty of One Operating Automobile in Approaching Crossing.—It is the duty of one operating an automobile, before entering upon a railroad crossing, to exercise ordinary care to discover the approach of a train or car and to avoid being struck by it and of colliding with the train or car, and the care required of him is such as an ordinarily prudent person would exercise under similar circumstances, and the same care is required of every one who undertakes to cross a railroad track at a crossing.

ALFRED SELLIGMAN, FRANK P. STRAUS, HOWARD B. LEE, HUSTON QUINN and ALFRED KRIEGER for appellant.

DAVID R. CASTLEMAN, O'NEAL & O'NEAL and PRYOR & CASTLEMAN for appellee.

OPINION OF THE COURT BY JUDGE HURT—Affirming.

On the line of the Louisville & Interurban Railroad Company, extending from Louisville to Fern Creek, is a station called Greenberg. It is eight miles from the city of Louisville. At this point the Bardstown turnpike runs parallel with the tracks of the railroad. At the south side of the railroad right of way and east and west of Greenberg station is the farm of E. H. Morgan, which adjoins the railroad's right of way. A macadamized road leaves the turnpike and running a little west of south crosses the railroad track just west of the station and passing immediately by the station, enters the Morgan farm. The cinder platform made around the shelter house at the station adjoins the macadamized road at its crossing over the railroad tracks and the shelter house,-which is surrounded by the cinders, is about twenty feet from the center of the crossing. It is about forty feet from the tracks of the railroad along the macadamized road to the edge of the traveled portion of the turnpike, and a mail box stands on the north side of the turnpike, just opposite the point where the macadam road intersects the turnpike, and the mail box is seventy-five feet from the center of the tracks, where the macadam road crosses them. The entrance into the Morgan farm is forty-eight feet, in a direction a little west of south, from the crossing. For a short distance on each side of the station, the fence between the right of way and the Morgan farm is curved toward the south, until the distance between the tracks and fence, at the apex of the curve, which is opposite the shelter house, is forty odd feet from the tracks, while immediately west and east of the station the distance between the tracks and the fence is only about fifteen feet. This curve is presumably to give room around the station for such uses as may be necessary. Just west of the station and on the right of way between the tracks of the railroad and the turnpike, and three or four feet from the tracks is a row of trees. The trees are eight in number and stand at intervals along the track, the first one being fifteen or twenty feet from the crossing, and the most westerly one probably near three hundred feet from the crossing. Upon some of these trees the limbs are eight or ten feet from the ground, and upon others of them the limbs hang nearer to the ground. Upon the second tree, to the west of the crossing, at the time of the occurrence hereinafter related and for several months,

theretofore, there was a large limb, which had broken down and was lying upon the ground alongside the tracks. On one of the days, at the beginning of the month of July, when the trees were in full leaf, including the broken down limb mentioned, the appellee, Marjorie Morgan, who is the wife of E. H. Morgan, and resided with her husband and family upon the farm, which has been described as lying to the south of the railroad right of way and east and west of the Greenberg station, approached the macadam road along the Bardstown pike, from in the direction of Louisville, in an automobile, with the purpose of passing over the crossing and going to her residence. The chauffeur was a colored man, by the name of Mickens. In the automobile, besides the chauffeur and appellee, was Lieut. James Castleman, who was sitting on the seat with appellee. When they reached the mail box, the machine was stopped and the chauffeur dismounted and took the mail from the box and handed it to appellee. Just at this time, the two young daughters of appellee having observed her approach from their home, ran over the crossing and to the automobile and got upon the seat between the appellee and Lieut. Castleman. The automobile was then turned into the macadam road, which led from the turnpike over the crossing at the station, and just as it got upon the railroad track, one of the cars of appellant company, approached the crossing from the west and collided violently with the automobile. The occupants of the automobile were thrown out of it to a distance of about twenty feet, and some of them fell upon each side of the track opposite the shelter house at the station. While painfully hurt, they miraculously escaped any serious or permanent injuries. The automobile, however, was substantially demolished. It was pushed sidewise along the tracks for nearly thirty feet, when the car stopped. Two of the wheels of the automobile were broken off, and the body of the machine twisted into a crescent shape, and it was otherwise injured so seriously that it was totally unfit for use. This action was instituted by the appellee to recover the damages suffered from the personal injuries sustained by her, and, also, for the damages suffered for the wrecking of her automobile, and the value of the use of it, while it was undergoing the necessary repairs to make it again serviceable. The trial below resulted in a verdict of the jury and a judg-

ment of the court in her favor for the sum of twelve hundred dollars in damages. The motion for a new trial by the appellant having been overruled, it has appealed from the judgment to this court.

(1) The grounds of complaint are, that the court erred in instructing the jury, and in refusing to instruct the jury as requested by appellant. By instruction No. 1, the court advised the jury, in substance, that it was the duty of the motorman on appellant's car to keep a reasonable lookout ahead for persons upon the tracks at the crossing, or so near to the track as to be in danger of being struck by the car, and if the jury believed from the evidence, that before the time of the collision the crossing had been, with the knowledge of those who operated the cars, so used by the public such a length of time, that those operating the cars had reasonable grounds to anticipate the presence of persons and vehicles upon the crossing, it then became the duty of the motorman to give timely warning of the approach of the car by sounding his whistle and to run the car at a reasonable rate of speed, and that it was the duty of the motorman to exercise ordinary care to so run and operate the car as to avoid coming into collision with persons and vehicles on the crossing, and if the jury believed from the evidence, that the motorman failed in any one or more of these duties and thereby caused the car to collide with appellee's automobile, and that appellee was injured or the automobile damaged thereby, that the law was for the appellee and the jury should so find.

(a) The objections urged to the instruction are, that it was not proper to instruct the jury that it was the duty of the motorman to keep a lookout ahead of the car for the presence of persons upon the crossing or so near to the track as to be in danger of being struck by the car, because there was no evidence to the effect that the motorman was not keeping such a lookout. The motorman, alone, testified that he was maintaining such a lookout ahead and no one expressly contradicts him in that statement, but there are some circumstances in the evidence from which the jury might have inferred, that he was not maintaining such a lookout, but, aside from this reason for embracing in the instruction the duty of the motorman to keep a lookout ahead upon the track for the presence of persons upon it at such a cros-

ing or so near to the tracks as to be in danger of being struck by the car, it may be said that such was a duty of the motorman, and that in such cases as the instant one, it is proper to give an instruction, which defines the duties of the motorman, and to keep a lookout is an important one of those duties. In Louisville Ry. Co. v. Byers, 130 Ky. 443, the same objection was made to an instruction and for the same reason as here. The court said:

"But whether there was any evidence of a failure of the motorman to keep a lookout or not, that part of the instruction objected to was nevertheless proper, and it has been repeatedly approved by this court in cases similar to this. . . . .

"It is necessary in such cases to define, in instructing the jury, the several duties imposed by law upon a motorman in operating an electric car, and none of these is more important than that of maintaining a lookout."

Such instruction has been approved in Louisville Ry. Co. v. Hutchcraft, 127 Ky. 531; Louisville Ry. Co. v. French, 24 R. 1278; Louisville Ry. Co. v. Bossmeyer, 104 S. W. 337; Owensboro City Ry. Co. v. Hill, 21 R. 1638; Louisville Ry. Co. v. Boutellier, 33 R. 484, and others.

(b) Another objection urged to the instruction is, that it submits to the jury the circumstances under which, at such a crossing as the one where the collision occurred, it became the duty of the motorman to give warning of the approach of the car, and to operate the car in approaching the crossing, at a reasonable rate of speed. The circumstances under which the jury was advised, that it was the duty of the motorman to give timely warning of the approach of the car, and to operate it at a reasonable rate of speed in approaching the crossing, were, that the crossing had been, with the knowledge of the motorman, so used by the public and for such a length of time that the motorman, as a reasonable man, would anticipate the presence of persons and vehicles making use of the crossing. The contention of the appellant is, that the crossing was a private one and made use of by the appellee and her family, only, and being such the appellant was authorized to operate its cars at such speed as was consistent with the safety of its passengers, and did not owe the duty of giving any

warning of the approach of its cars to the crossing, and in fact owed the appellee no duty, except that of using ordinary care to avoid injuring her, when she was discovered to be in peril. In other words, that she in using the crossing, was not a licensee, and that the only duty owed to her was such only as the law vouchsafes for a trespasser. If the crossing at Greenberg station was simply a private crossing in the country, then there can be no doubt that the appellant, in passing over it, was not required to give any warning of the approach of its cars to the crossing, nor to moderate the speed of its cars, but might operate them at such speed as it desired, consistent with the safety of its passengers. L. & N. R. R. Co. v. Engleman's Admr., 135 Ky. 521; Johnson's Admr. v. L. & N. R. R. Co., 91 Ky. 651; C. & O. Ry. Co. v. Hunter, 170 Ky. 4; Epeigle v. C., N. O. & T. P. Ry. Co., 170 Ky. 285; Stull's Admx. v. Kentucky T. & T. Co., 172 Ky. 650; L. & N. R. R. Co. v. Bodine, 109 Ky. 509; Early's Admr. v. Louisville, etc. R. R. Co., 115 Ky. 13  In Stull's Admr. v. Kentucky T. & T. Co., *supra;* and C. & O. Ry. Co. v. Hunter, *supra,* however, it was held, that if the railroad has customarily given signals of the approach of trains to a private crossing, and these were relied on by the persons using the crossing, and one was injured on the crossing by the failure to give the signals, a recovery might be had. It was, also, held in the two last named cases, that if the crossing is one, where the presence of persons is to be expected, and, therefore, anticipated, a lookout duty rests upon the railroad company. If the crossing is a private one, in the country, and it is shown that the public generally uses the crossing with the knowledge and acquiescence of the railroad company, the presence of persons upon the crossing is to be anticipated by those operating the trains. The use of a private crossing by many persons does not put upon the railroad a lookout duty as to them, nor require an anticipation of their presence upon the track or dangerously near to it, unless the use is with the knowledge and acquiescence of the railroad. It may, however, be said, that wherever, from the nature and use of a crossing by the public, the duty is imposed upon the railroad of anticipating the presence of persons upon the crossing, the duty of the ones operating a railroad train to maintain a lookout, to give warnings of the approach and to have the train under

control follows.    Corder's Admr. v. C., N. O. & T. P.
Ry. Co., 156 Ky. 536; L. H. & St. Ry. Co. v. Lyons, 146
Ky. 603.    It is true, that in most of the instances where
it has been held that the duty of maintaining a lookout,
giving warnings, and regulating the speed of trains has
been imposed upon railroads from the use of a crossing
by the public and the acquiescence of the railroad com-
pany, have been crossings in towns and cities and popu-
lous communities, but it was said by this court in Carter
v. C. & O. Ry. Co., 150 Ky. 525:

"The fact that the accident did not occur in an incor-
porated city or town can not of itself affect the case.
It is the nature and use of the crossing by the public,
that is to determine the applicability of the rule, which
requires the lookout duty.    C. & O. Ry. Co. v. Warnock's
Admr., 150 Ky. 75.    If the use of the tracks by the pub-
lic for crossing purposes was general and acquiesced in
by the railroad company, it was charged with notice of
such use and the trespasser became a licensee, to whom
the company owed a lookout duty, although the accident
happened in the company's yards."

In Cahill v. Cincinnati, etc. Ry. Co., 92 Ky. 345, it
was held that one who was travelling over a private
crossing, which was nearby to a public crossing,
might rely upon the giving of customary signals at
the public crossing, and the failure to give such
signals at the public crossing was negligence as to the
one passing over the private crossing.    Paducah, etc.
Ry. Co. v. Hoehl, 12 Bush 41; Louisville, etc. Ry. v.
Goetz's Admr., 79 Ky. 444.    In the instant case, it was
alleged in the petition and not denied by the appellant
in its answer, that the crossing had been "habitually
used by the public for more than five years" before the
collision, "at all hours of the day and night in passing
to and from said Bardstown pike and said Greenberg
station, both on foot and in vehicles."    It does not ap-
pear who constructed the macadam road leading from
the pike, a distance of about forty feet, to the crossing.
The shelter house at the station is on the other side of
the railroad tracks from the pike, immediately beside
the macadam road and the crossing, and there appears
to be no other way from the turnpike to the station for
the public, except over the macadam road and the cross-
ing.    Since the station is situated between the railroad
tracks and Morgan's fence, there is no way for persons

who propose to use the cars of appellant, to get to them, except from the side upon which the turnpike is, and over the macadam roadway and crossing, and persons alighting from the cars at the station must depart over the crossing. If freight is brought to or carried away from the station, or vehicles used by persons who come and go therefrom, the vehicles are obliged to pass over the crossing. Thus it is, that the appellant has not only acquiesced in the use of the crossing by the public, but has invited them to make use of it. The rural community surrounding the station is populous, and hence it may be inferred that the use of the crossing has been and is considerable. While the crossing is the way used by appellee for entering her premises from in the direction of the Bardstown road, it is a misnomer to call it a private crossing. Of course the appellant can not invite the public to make use of the crossing, and then give no heed for their safety while doing so. The use for which appellant created the crossing impressed it with a public nature, and the ones operating appellant's trains had the duty imposed upon them to anticipate the presence of persons and vehicles upon the crossing, and to take and maintain such reasonable precautions for their safety as the situation demanded, and such as are usual in such cases. The appellee, as one of the public in the use of the crossing, could rely upon the presumption, that the appellant, in the operation of its cars at and over the crossing would perform those duties which it owed to the public. Hence, the appellant can not justly complain of the instruction, which required its motorman to maintain a lookout, to give warnings and to operate the train at a reasonable rate of speed, if the jury found from the evidence that the duration and extent of the use of the crossing by the public, with the knowledge of the motorman, was such as to create reasonable grounds to anticipate that persons and vehicles might be upon the crossing.

(3) By instruction No. 2, the jury was directed, that it was the duty of the chauffeur in charge of the automobile to exercise ordinary care to discover the approach of the car and to avoid colliding with it, and to so run and operate the automobile as to avoid being struck by the car, and that if he failed in any of his duties and his negligence caused or so contributed to cause or bring about the collision, as that, except for his

negligence the collision would not have occurred, to find for the appellant, although it might believe from the evidence that the motorman was negligent. The objection urged by appellant to this instruction is, that it was one of the duties of the chauffeur to sound the horn upon the automobile before proceeding to drive the automobile over the crossing. It is contended that the court should have directed the jury that it was the duty of the chauffeur, when he started from the letter box and entered the macadam road to the crossing and as he approached the track, to have sounded the horn, and the failure to so specifically instruct the jury is an error prejudicial to the substantial rights of appellant. It will be remembered that the automobile did not cross the pike at all, but came along the pike and turned into the road, which led over the crossing, after stopping near the letter box. As a matter of fact, the horn was not sounded as the automobile approached the crossing, and the question is presented, whether the failure of an automobile to sound its horn while approaching a railroad crossing is such negligence, *per se,* as to bar a recovery for damages to the automobile, when it is demolished upon the crossing by the negligence of the railroad company. The rule in this state is, that contributory negligence such as, without which the injury would not have been received, bars a recovery, and in the instructions to the jury in such cases the courts have not established any other rule for an automobilist, who is suing a railroad for damages to his automobile, than is applied to the owner of a wagon, threshing machine or other vehicle, whose owner undertakes to cross a railroad track with it and is struck by a train being operated upon the track. If one with a traction engine proposes to cross a railroad track, the jury is not told that it becomes the duty of the owner of the engine to sound a whistle from it, nor is the owner of a wagon or other vehicle required before crossing a railroad track to shout or to sound a horn as a warning to the ones operating the cars upon the railroad tracks. The duty ordinarily required of one about to cross a railroad track, if he would escape contributing to his own injury by negligence, is to exercise ordinary care to discover the approach of a car and to avoid being struck by it, and to so use and move his own vehicle as to avoid colliding with the car upon the railroad track. The care required

of him is such care as an ordinarily prudent person would exercise under similar circumstances. The same standard of care applies to every one who undertakes to cross a railroad track, whether he is upon horse back, on foot, or occupying a wagon or automobile. The danger of the crossing, the inability to observe because of natural obstructions, the qualities of the horse driven or the automobile in use, the failure to sound a horn or to look for the train, and many other circumstances are proper subjects for consideration in determining whether the traveller has or has not exercised ordinary care; but these are matters to be considered and passed upon by the jury in determining whether the traveller has or has not exercised ordinary care, under the circumstances, to lookout for the car and keep out of its way. Our attention has not been called to any case in any jurisdiction where it has been held that it was the duty of the court to specifically direct the jury, that when an automobilist proposes to cross a railroad track, to avoid the imputation of contributory negligence, he must sound the automobile's horn. In Kellogg & Co. v. L. & N. R. R. Co., 164 Ky. 534, was where the owners of a motor truck sued the railroad company for damages for colliding with the truck upon a crossing, and an instruction relating to the contributory negligence of the complainant, substantially in the same form as the one objected to, in this case, was given and approved by this court. The further contention, that it is the duty of the driver of an automobile, before entering upon a railroad crossing, to stop, to look and to listen for a train, which might be approaching, has never been adopted in this jurisdiction, nor has the rule been applied to the driver of any kind of a vehicle as a hard and fast rule of law. The same conclusion was arrived at by the Montana Supreme Court, in Walters v. Chicago, M. & P. S. R. Co., 46 L. R. A. (N. S.) 762, and the cases therein cited.

(4) An objection is, also, urged to the instruction, by which the court defined the measure of damages, if the finding was for the appellee. The proof was to the effect, that appellee was obliged to send her automobile to the factory, which made it, in order to have it repaired; that the necessary repairs cost the sum of one thousand and twenty-four dollars, and that the freights which she was compelled to pay for the transportation

of the automobile to the manufacturer and its return was about one hundred and fifteen dollars; that from the collision to the return of the automobile in a repaired and serviceable condition was sixty days; that the rental value of such an automobile during that sixty days was reasonably the sum of ten dollars per day. Among the other items of damages which the instruction permitted the jury to find for the appellee was "such sum as you believe from the evidence will reasonably and fairly compensate plaintiff for the loss of the use of the machine during such reasonable time as you believe from the evidence was necessary to repair the machine, and in arriving at such amount you will estimate the reasonable rental value upon the market in Louisville of the machine or other machine of like capacity and equal performance, the user furnishing the driver and bearing all such other expenses as the owner himself would have to bear in the operation of his own car, not to exceed on that account six hundred dollars." The objection urged to this part of the instruction is not that it is not a correct measure of damages for the item, but that the court improperly submitted to the jury to find the reasonable time, which was necessary in which to repair the machine, and that the jury found that sixty days were necessary, when there was no evidence that it required such a length of time, and that the verdict finding that the damages on account of the loss of its use was three hundred dollars, was not based upon any evidence, because the evidence was that the rental value was ten dollars per day, which would make the damages upon that item six hundred dollars, instead of three hundred dollars. While it does not appear upon what ground the appellant can complain of the verdict against it, being smaller than it should have been, suffice it to say, that there is nothing in the verdict, from which it can be said how many days the jury was of the opinion that it was necessary in which to make the repairs or at what price per day that the rental value of the machine was found by the jury. The jury did not find anything for appellee for personal injuries suffered by her, but found the damages to the automobile to be nine hundred dollars, and the value of the loss of her use of it until repaired at the sum of three hundred dollars, and the evidence was amply sufficient to support the verdict. The instruction conforms

substantially to that directed by this court in Southern Ry. Co. in Ky. v. Ky. Grocery Co., 166 Ky. 94.

(5) The contention, that the court was in error in overruling appellant's motion for a direct verdict of the jury in its behalf is not tenable. As regards the charge of negligence on the part of appellant, the evidence is contradictory as to whether the motorman gave any signals of the approach of the car to the crossing at the station. He stated that he caused one whistle, when about four hundred feet from the crossing, to be blown, and is corroborated by certain persons who were on the car, while appellee and those with her state, that although they listened for signals, they heard none. The witnesses differ as to the speed of the car, and although the jury may have believed that the motorman gave the one whistle, on account of the fact that the approach to the crossing was obscured by the broken limb upon the tree, and the coming of the car was obscured from appellee and her party by the same limb and other trees, and the fact of these obstructions being within the knowledge of the motorman, the jury could have inferred that the one whistle was not a sufficient precaution for the approach of the car, which the motorman stated was being operated at a "full current." As to the defense of contributory negligence on the part of appellee, she and her chauffeur, as well as her guest, Lieut. Castleman, testify that they both looked and listened for the approach of a car before going upon the crossing, and drove at the rate of only three or four miles an hour; that they did not hear any signal, nor see the approach of the train until it was within twenty or thirty feet of them, when they could not escape. It is not to be presumed, that they knowingly went upon the track, immediately in front of the car and thus endangered their lives. The facts and circumstances are such, in regard to the claim of contributory negligence, that men of fair judgment might reasonably differ as to whether the chauffeur and appellee used ordinary care to look out for the car and to avoid a collision with it, and hence the question was one for the jury.

The judgment is, therefore, affirmed.